[No. 3785.]

## PARKDALE FUEL COMPANY V. TAYLOR.

1. NEGLIGENCE—*Circumstantial Evidence,* is sufficient to establish; direct evidence is not required. (315)

2. —— *Evidence—Sufficiency.* Action for the death of one employed in a coal mine, attributed to negligence of the mine owner in failing to provide places of refuge, along the slope where the cars were operated for removing the coal, and the employes were wont to pass in going to and from the lower workings; also in failing to provide proper appliances to prevent the escape of cars into the slope.

Evidence examined and *held* sufficient to warrant a verdict for plaintiff. (306-315)

3. APPEALS AND ERROR—*Verdict on Conflicting Evidence,* is conclusive in the court of review. (315)

4. ATTORNEY—*Misconduct.* Action against a mining company for negligence causing the death of an employe in the mine. Plaintiff's counsel, in the examination of a juror on the *voir dire* asked if he was acquainted with the counsel appearing for the company, "who," he said, "represent the Ocean Insurance Company in this case." This assertion of counsel was a mere assumption, not justified by any evidence, and, as the court concluded, was an attempt to impress the jury with the idea that a verdict against the defendant would not be injurious to it. The

court denounced it as "very reprehensible," justifying a reversal of a judgment in favor of plaintiff, where the evidence was equally balanced, or it appeared probable that the irrelevant matter so improperly brought to the attention of the jury had exercised a controlling influence in their deliberations.   (316)

*Appeal from Boulder District Court.*   HON. HARRY P. GAMBLE, Judge.

MR. JULIAN G. DICKINSON and MR. A. H. FELKER for appellant.

MESSRS. DAVIS, WHITNEY & MOTHERSILL for appellee.

*On rehearing.*

BELL, J.

Appellee, plaintiff below, hereinafter called the plaintiff, charges in her amended complaint that her husband, Job O. Taylor, while in the employ of The Parkdale Fuel Company, appellant and defendant below, hereinafter called the defendant, was killed as the result of its negligence in failing to provide places of refuge along its slope in its coal mine, known as the Parkdale mine, located in the town of Lafayette, County of Boulder, and State of Colorado, as required by the provisions of R. S., 1908, sec. 644, and in failing to furnish proper safety devices and appliances at the head of said slope, near the tipple, so as to prevent the escape of cars down said slope.   She further charges that the death of her husband was caused by the negligence of one Stephen Gobo, a fellow servant and co-employe, for which she contends the defendant company is liable under the provisions of sec. 1, ch. 67, Session Laws of 1901, sec. 2065, R. S., 1908, and alleges that his negligence consisted in his "failing to take the proper steps, and to do the necessary acts, to prevent the said coal car from leaving the tipple of the said mine until the said car was properly coupled and attached to other cars, and held under control by the cable which regulated the descent of said coal cars into the said mine."

On each of the three causes of action relied upon, she demands judgment in the sum of $5,000 and costs of suit.

The answer contains a general denial, and sets up, as defenses, the assumption of risk, and contributory negligence on the part of the deceased, and the invalidity of the act relied upon, known as ch. 67, Session Laws of 1901, providing for a right of action for injuries or death resulting from the negligence of a fellow servant or co-employe.

All of these defenses are denied in the replication, and the case was tried to a jury, which found for the plaintiff in the sum of $5,000, and upon the verdict, after overruling a motion for a new trial, the court entered judgment in accordance therewith.

There are numerous errors assigned, 54 in number, three of which are directed to an alleged misconduct of counsel in the examination of a juror on his *voir dire*, five to the admission of testimony over the objections of counsel, one to the amendment of the complaint, five to the application of the law and the weight of the evidence, and the remainder to the giving and refusing of instructions. The merits of the appeal, however, rest, in our opinion, upon the sufficiency of the evidence received at the trial to support the verdict of the jury and the judgment entered thereon.

The undisputed testimony shows that the slope in which the plaintiff's husband was killed was about 1,000 feet long and about eight feet wide in the vicinity of the accident, and that all the coal was taken from the mine through this slope in trips of four cars each. The rope or trip rider, Louis Evans, received the trips of loaded cars at the bottom of the slope, and rode on the front car of each trip, where the rope was attached, until the trip would reach the surface, where it was received by the men on the top of the slope, weighed, dumped, coupled together again by means of coupling pins, and made into a trip of empties to be returned to the mine through the slope, when the next loaded trip should reach the surface. When the loaded trip was over the knuckle, or

safely beyond the mouth of the slope, the trip rider would detach the rope therefrom and attach it to the trip of empties, and when the trip of empties was ready for descent, he would signal the engineer in the tipple house, and return with it into the mine.    Stephen Gobo was employed on the top of the slope, or on the tipple, and it was his duty to receive and prepare the empty cars for descent.    He had been ill with typhoid fever for a time, and commenced or resumed his duties the morning of the accident.    To prevent an escape of cars down the slope, there was a block bolted to a plank some distance from the knuckle, or mouth of the slope, and this block was placed or swung across the rail or track while the empty cars were being prepared or made into a trip for descent; and when the descent was about to be made, the block was removed from the rail or track, and the cars moved to the mouth of the slope, whenever necessary, by the trip rider and Gobo until they acquired sufficient momentum to descend. At the time of the accident, there were about 100 men employed in the mine, and all generally entered and returned to their places of work through the slope.    Their hours were from 7:30 a. m. to 4 p. m., and one trip of four cars was run at each of those hours for the men to ride into and out of the mine.    Those trips were insufficient to accommodate all of the men, and, therefore, some of them were obliged to walk up and down the slope.    A set of electric wires about three inches apart was strung along the side of the slope, from the bottom thereof to the tipple house on the surface, by which any person being or working anywhere on the slope might signal the engineer in the tipple house by making a circuit with a short piece of iron or metal, which the employes usually carried with them, and thus suspend the operation of the slope as long as necessary.    Regarding the places of refuge, or safety holes in the slope, Thomas Page. the pumpman at the mine, a witness for the plaintiff, testified in part as follows:

"There was nothing regular about any specified amount of manholes up and down the slope. There was a hole on the right hand side of the slope about fifty feet from the knuckle, where they used to pull coal. Down where the second level runs off to the left there is a hole you might get into, but there is a track in there and the cars run. Twenty-five or thirty feet below there is a cross-cut leaves a little place for a man to jump into; either from the main slope or on the back slope to the track on the main slope has been graded down so you have to climb up from two to four feet. These are the only holes on the slope."

In this respect he does not seem to be contradicted. In fact, his seems to be the only testimony elicited by either party regarding the places of refuge or safety holes along the slope. He further testified that the slope "is about a 7x9 slope where it is mechanically dug, and it goes down to where it takes the first pitch down  *  *  *  there is places where you could probably stand like this and the car would probably pass you if it was on the track. There was nothing regular about the slope." In this he seems to be contradicted by H. H. Smith, foreman or pit boss at the mine, a witness for the defendant, who testified that the slope ranged from 8 to 20 feet wide. There were about 30 rollers along the entire length of the slope to prevent the rope from dragging on the ties and ground, and the average life of each roller was from a month to two months, so that it was necessary to repair or replace from 15 to 30 rollers per month. It was the duty of the deceased to do any "work that he had to do about the mine," to keep the slope in which he was killed in repair, and to examine, oil, clean and promptly repair or replace the rollers when necessary. No other person had charge of this work. He was a "handy man," or general repairman, about the mine, and was very competent in his work. Concerning his presence on the slope at the time of the accident and the attending conditions, Page, above named, testified in part as follows:

"He (Taylor) was under the supervision of the boss. Whatever the boss told him to do. * * * He seemed to be attending to the slope and doing carpenter work around the mine. I was what they call the pump-man. Pumped the water and laid pipes for air and water. * * * At the time of his death I was on a place they called the first level, just off to the left of where he was killed, probably two hundred feet away from him. I went immediately to the place. Prior to the day of this accident the pit boss (Mr. H. H. Smith) had sent Mr. Taylor to build me a little shop in the mine. * * * I didn't have a shop to work in and I called the attention of the pit boss, and he sent Mr. Taylor down to build anything I instructed him to build, so I told him what I would like to have, and he set about doing it. This was the day prior to the accident. He didn't get it finished that day. Next morning when we came to the mine, Mr. Taylor went into the mine as usual. He went ahead of the men and ahead of the cars to oil the rollers so that he would not be on the slope when the cars was going up and down. * * * Mr. Taylor come to me and says, 'I didn't get your shop quite done, but I will finish it right away as soon as I can. I am ordered to go up on the slope and fix a roller, but as soon as I get the roller fixed I will return down and fix your bench —your shop.' Well, Mr. Taylor had left me quite a little bit. The rope rider comes into the mine and says: 'Do you know where Old Man Taylor is?' I says, 'He went through the braddish to go up the back slope.' He says, 'You tell him if that roller isn't in the right place I will move it when I come back next trip. I have orders to put it off there, but I don't know whether I got it in the right place or not.' I says, 'You will find him on the slope, I think.' The rope rider went up with the usual trip. Mr. Smith come in and says, 'I told Taylor to put in that roller on the slope. Did he go to do it?' I says, 'I think he did.' The roller was right close to what we call the first knuckle down in the mine. I should say that from this first timber down to the roller was about three

hundred feet. The next time I saw Mr. Taylor he was dead, lying by a switch in the mine. It is quite a ways below this roller that was to be repaired. I should judge from 100 to 125 feet. I went right there. I was the first one that went there with Sam (deceased's son). I was there with Sam first. He was lying with his face in towards the roof and his hands like this, and his feet lying straight back under him like this way. I could not recognize the body. Did not know whether it was his father or not until after the son found his father's watch. I came to the conclusion that it must be his father. The car was on the other side of the track. * * * This accident occurred about nine o'clock in the morning. They found his watch stopped, but I don't remember the hour. * * * I went to work at seven-thirty that morning. I had this talk with Mr. Taylor in the mine right after we got on the bottom. He and I went a little before the men in order for him to grease the rollers. * * * There was something to indicate where the car struck Mr. Taylor. On the roof was the oil that came from the kegger, he used to fill his lamp with. The oil had splattered on the coal and on the roof. The body was found 75 to 100 feet below. A man traveling around in the mine carried his kegger because it carried his supply of oil. Mr. Taylor carried his strapped around his waist. There was a broken roller on the incline about three hundred feet from the top, from the first timber in the slope. The oil on roof and on the coal was down a few feet, from twenty-five to fifty and seventy feet below the broken roller."

The car referred to by Page as being on the other side of the track from the body of the deceased, or, in fact, the car involved in the accident complained of, was the first of a trip of four cars that was about to descend the slope in the usual manner of operation. The trip was attached to the rope, and was being moved by the men on the tipple, to the mouth of the slope, when the car in question escaped and ran wild down the slope. Mrs. Anna Klouse, an eye witness to

the escape of the car, called on behalf of the plaintiff, testified in part as follows:

"I live about a block from the tipple of the mine, right back of the tipple. I could see the tipple from my house. At the time of this accident, November 30th, I was standing in my kitchen door. I could see the loaded cars as they came up and the empty cars as they went down. I could see them push them in the place where they dumped them, but I could not see the men dump the cars. I could see as plain as I could see from my place, where they pushed the empty cars back as they would go over the knuckle and down the shaft. I think there were three men on the tipple at that time. I saw the runaway car as it left the tipple, and went down the shaft. I was looking that way at the time when it broke loose. I don't think the car was coupled. There were four empty cars in that trip. One went down the slope—the one that was coupled with the other three cars. The men put their back up against the cars to push them over the knuckle. Two men were there at that time pushing on the cars. Gobo was the name of one of the men and Louis Evans was the other. * * * When I saw this empty car—this runaway car—I went to the mouth of the slope. My husband was down to the blacksmith shop that day. He was working the day before. The empty cars just went off the tipple down into the slope. It was all that I seen after it went down the slope. All anyone seen I guess. When I got there Mr. Evans he had went down to see the man that was killed, and he was coming back up the slope."

On cross-examination, she testified as follows:

"I know that the car was not coupled because it didn't make any noise or it could not get away. I argue that because it could not have got away it wasn't coupled. I could not see from my place. I could not see if it was or if it was not. I could not see whether the car broke apart. It didn't make any noise. The other three cars, to my knowledge, stood where there were. They didn't go down the slope

at the time. They was up on the level ready to dump over when this other car went down the slope. This other car broke loose. I don't think those other cars broke loose. They stood still—stopped at once."

John Post, also a witness for the plaintiff, testified in part as follows:

"I was blacksmith at the mine. I was on the outside of the blacksmith shop when the car went down. I was standing about fifteen to eighteen feet away from the track. The car passed right by me. The loaded car come up as I stayed there. I was standing on the west side of the slope. The blacksmith shop is on the west side, about twenty-five feet away from the slope and I stood on the front of the blacksmith shop and as the car passed me here, I been about fifteen or eighteen feet away from the slope.

"Q. * * * You said that Louis Evans hollered to the man 'Are you ready?' A. Yes, sir, 'ready.'

"Q. What did the man say? A. The man says 'yes.' So he took the block out and Louie Evans got behind them empty cars; he is the rope rider; and another fellow helped pushing them about two feet and then the front car went off, and the rope rider went down and stopped the empty cars from going down, and he followed right into the slope.

"I can't tell you whether that car was coupled or not. The four cars is right there and he is around them cars. I see him around the cars when they stayed there, and I can't say as he coupled them or not. The front car run off. If it had been coupled it would not have run off."

Cross-examination:

"* * * Louis Evans and Stephen Gobo, were both together, at the top. Gobo pushed the block out. Gobo hollered down, 'Is everything all right.' He took the chain down from the loaded cars. He threw the chain down, about two feet, and then Louis Evans jumped down, and coupled the four empties and then he hollered at that man, if he is ready. I seen him going between the cars. I can't say that he

coupled them.  I know that three were coupled, because they stood after the accident.  He stopped the engineer right away as the front car run off.  *  *  *"

Accidents of this kind had previously happened on the slope, and the dangers of being or working on the slope were well known to the deceased and other employes, but it was testified to by witnesses for the plaintiff that the men continued to assume the risks upon the promises of the officials of the company to improve conditions, and to make the necessary improvements to avoid the dangers complained of.  The witnesses referred to are Mr. Frank Smith and Mr. Percy Brillheart, who testified that they, as representatives of the union, discussed the dangers complained of with Mr. H. H. Smith, foreman, and Mr. John Webb, superintendent of the mine, and Mr. Watson, general manager of the company. Mr. Webb, however, testified, as a witness for the company, that he never had any conversations with the witnesses named, except as to man-cars and a manway.  Webb and Smith both testified that general instructions were given that no one was allowed to travel the slope during working hours, and that, prior to the accident, written notices to the same effect were posted; but at least four witnesses for the plaintiff testified that no such notices were posted until after the accident; and even Webb and Smith contradicted each other as to the place where said notices were posted—Smith testifying that they were posted on the side of the slope, and Webb testifying that they were posted on the front of the slope.  Smith denied having instructed Taylor to repair any rollers the morning of the accident, or having talked to Page about Taylor repairing the same, as testified to by Page.  Page testified that his duties required him to be on the slope at almost all hours of the day, but Smith contradicts him in this respect, as follows:

"I don't know what business Mr. Page had at any time on that slope.  Not in reference to doing any work on that slope that I know of.  There was nothing there for him to do in any way, shape or manner.  *  *  *  Page hadn't

any work on the slope at any time. Mr. Page had no instructions to go back and forth, he could order his pipe or supplies brought down by the trip rider."

He, Smith, however, appears to be in turn contradicted by Webb, whose testimony in the matter is abstracted as follows:

"Q. Now, Mr. Page was your pump-man? A. Yes, sir. * * *

"Q. Don't that pipe line go out this slope where you haul the coal? A. No, part of the way, and part of the way on the old slope.

"Q. It comes part of the way on the slope where you haul the coal? A. Yes, sir.

"Q. If that pipe got out of order, Page had to go up there and fix it? A. Yes sir, sure.

"Q. And in doing that he had to go upon the slope? A. If he fixed the pipe, yes sir.

"Q. Now, practically, that was the sole and only duty that Mr. Page had, was to take care of the pump and pipe line? A. No, he had more than that. He had to look after the air pipes and everything like that.

"Q. Did the air pipes go up and down the slope? A. Yes sir, the main air pipes.

"Q. So, if he had any trouble with those main air pipes, he had to go on the slope? A. Sure.

"Q. He had to in working hours? A. Well, I never seen him.

"Q. It wasn't what you saw? A. Yes sir, yes.

"Q. If he had to repair those things during working hours, he had to go the slope, whether you saw him or not? A. Yes, sir.

"Q. Now, if Mr. Taylor wanted to repair rollers, he had to go on the slope in working hours to do it? A. He had.

"Q. Whether you saw him or not? A. Yes sir, whether I saw him or not.

. "Q. And he kept the rollers in repair?  A.  Yes, sir."

Under the foregoing condition of the record, we apprehend that it would be rather difficult to organize an impartial jury that would not find the defendant guilty of negligence, and especially in allowing the runaway car to escape from the tipple.

"In actions of this character, it is not necessary to show by eye-witnesses that the deceased came to his death because of negligence on the part of the defendant and freedom of negligence by the deceased.  These matters may be proven by showing circumstances from which their existence may fairly and logically be presumed." *Hotchkiss Mt. M. & R. Co. v. Bruner*, 42 Colo. 305, 309, 94 Pac. 331, 332.

The jury found the issues for the plaintiff on somewhat conflicting evidence, and such a finding is binding on this court: *Big Five T. O. R. & T. Co. v. Johnson*, 44 Colo. 240, 241.

We have examined the numerous assignments of error, including those directed to improper testimony and to the instructions, and find none of them sufficiently serious to warrant a reversal of the judgment.

Defendant's assignments of error 1, 2 and 3, urging the misconduct of plaintiff's counsel (appearing at the trial in the District Court, but not upon this review) wherein the juror Tobias, on his *voir dire* examination, was asked,

"Do you know Mr. Felker or Mr. Dickinson, who represent the Ocean Insurance Company in this case?" have given the court serious concern.

The assumption of counsel that Messrs. Felker and Dickinson represented the Ocean Insurance Company in the case was voluntary and without justifiable excuse.  There was no evidence whatever to support the assumption, and the court must conclude that the purpose of counsel was an endeavor to prejudice the minds of the jury by informing them that the Ocean Insurance Company had obligated itself to pay the damages sustained, and that a judgment against the defendant

would be without injury to it. Such conduct was not ethical, and was very reprehensible.

If a controlling question of fact in this case rested upon evidence that was quite equally balanced, or if the condition of the evidence was such as to make it probable that such extraneous matter wielded a controlling influence over the minds of the jurors, then it would be the duty of the court to reverse the judgment. In *Coe v. Van Why*, 33 Colo. 315, 321, 80 Pac. 894, 3 Ann. Cas. 552, the Supreme Court held it error for counsel, without any evidence upon which to base his statement, to comment in his argument to the jury upon the custom of mining companies to protect themselves against liability on account of injuries to their employes by taking out insurance, in insurance companies, against such liabilities. It was also held in the same case that the error was not cured by an instruction from the court to disregard the comments of counsel. However, in that case, the court said there were several closely contested questions of fact, and that there had been one mistrial of the cause. In *Tanner v. Harper*, 32 Colo. 156, 165, 75 Pac. 404, when the jurors were being empaneled, counsel for the plaintiff stated to them that an insurance company was the real party in interest. The Supreme Court held that the great weight of the evidence favored the plaintiff, and showed affirmatively that the defendants were not injured by such statement, and that it appeared from the record that there were no close questions of fact in the case.

From the state of the record in the instant case, it may well be said that the evidence is such that, in all probability, the same verdict would have been returned by the jury had counsel not been guilty of the reprehensible conduct of asserting, by inference at least, to the panel of jurors on a *voir dire* examination, that counsel for defendant represented the Ocean Insurance Company, and, therefore, it may be logically said that in this case it affirmatively appears from the record that the verdict was not the result of the misconduct of counsel,

but is sustained by sufficient evidence, and the judgment is, therefore, affirmed.

*Affirmed.*

---

HURLBUT, J., dissenting.

My dissent to the majority opinion is based solely upon a conviction that it is in direct conflict with the prior decisions of our Supreme Court.

The interrogatory propounded to the juror upon his *voir dire,* and upon which the validity of the judgment hinges, was as follows:

"Q. Do you know Mr. Felker or Mr. Dickinson, who represent the Ocean Insurance Company in this case?"

The question was promptly objected to, but the objection was not explicitly sustained by the court. The form of the interrogatory in no way tended to elicit from the juror any information or knowledge which might be a possible guide to plaintiff in the exercise of a peremptory challenge or one for cause. There was no issue formed by the pleadings which would permit of any evidence tending to establish the fact that either Mr. Felker or Mr. Dickinson was acting as counsel for the Ocean Insurance Company in the action being tried by the court. The form of the question precludes any assumption that the interrogatory was made in good faith, or for any other purpose than to directly prejudice the minds of the jury against the defendant. But one motive could have actuated the interrogatory in question, namely, to thereby communicate knowledge to the venireman interrogated, as well as all other prospective jurors present, that the Ocean Insurance Company was interested in the case, and would have to respond to any judgment that might be rendered against defendant; in other words, that The Parkdale Fuel Company was only the nominal defendant, while the insurance company was the real defendant in interest. The

commanding issue in the case to be tried by the jury was as to whether or not the defendant had been guilty of negligence in causing the death of plaintiff's husband. The record shows that the widow and children of deceased were present at the trial and testified. This fact of itself would have a tendency to enlist the sympathy of the jury for the misfortune overtaking the widow and orphans, through the deplorable death of their protector. Under these circumstances common justice required that defendant be accorded a fair and impartial trial of the issues, without the interpolation of any inadmissible matters which would tend to prejudice its rights. Can it be said, with even reasonable certainty, that defendant could hope for an unbiased and dispassionate consideration by the jury of the question of negligence, as between itself and plaintiff, if the jury believed, and had good reason to believe, that no verdict which they would render in favor of plaintiff would in the slightest degree affect The Parkdale Fuel Company, but any judgment founded thereon would have to be paid by one of the great insurance companies of the country?

The case of *Coe, et al. v. Van Why,* 33 Colo. 315, 80 Pac. 894, 3 Ann. Cas. 552, was a personal injury action wherein plaintiff's counsel, in his argument to the jury, commented on the custom of mining companies, in protecting themselves against liability on account of injuries to their employes by taking out insurance, there being no issue upon the matter. The trial court immediately admonished counsel, and instructed the jury to disregard such statement, and not to consider it for any purpose. The Supreme Court, however, held that such admonition and instruction did not cure the error, saying:

"We are satisfied that the unfavorable impression on the minds of the jury was not removed by the direction of the court to disregard the statement. Counsel knew when he made it that it was improper and reprehensible, and it is fair to presume that he would not have done so, had he not sup-

posed that some advantage to his client would thereby be gained. In such cases counsel who thus seeks to obtain that result takes upon himself the risk of losing what he hopes to secure. The following, among other cases, are authority for the reversal of the judgment for such conduct of counsel," citing cases.

In the instant case the trial court not only failed to clearly sustain the objection, or reprimand plaintiff's counsel for propounding the interrogatory in question, but it in no way admonished the jury at that time or subsequently that the interrogatory was improper, and that they should disregard the same for any purpose in deliberating upon their verdict. By failing to do so, I think the court was remiss in its duty, and its silence in that behalf emphasizes the error and prejudice suffered by defendant thereby. It must be apparent from what has just been said that the error committed was more aggravated than in the Coe case. The trial court had four opportunities (emanating from motions made by defendant's counsel) to discharge the jury and grant a continuance or new trial, the first of said motions being made while the jury were being impaneled, the second at the close of plaintiff's testimony, the third at the close of the trial, and the fourth in the hearing upon motion for new trial. In each instance the court denied the motion.

*Vindicator Con. C. M. Co. v. Firstbrook,* 36 Colo. 498, 86 Pac. 313, 10 Am. Cas. 1108, was another personal injury case, in which the veniremen, being examined upon their *voir dire,* were asked, over objection, if they were interested as agents or otherwise, or ever had been interestd, in The Frankfort Marine Accident & Plate Glass Insurance Company, no such issue being involved. The supreme court decided that the questions were proper, but adhered to and reaffirmed in no uncertain language, the doctrine laid down in the *Coe v. Van Why* case, saying:

"In the selection of jurors counsel are allowed considerable latitude not only for the purpose of ascertaining whether

or not grounds exist for challenges for cause, but, also, for
the purpose of intelligently exercising peremptory challenges.
Such questions are for the purpose of eliciting information
from, and not imparting it to, the jurors. They are not
barred, however, though directed to matters not in issue, pro-
vided it appears they are pertinent, are made in good faith,
and for the purpose of excluding from the panel partial or
prejudiced persons, or those who, by reason of interest in
the result, would be incompetent. * * * In announcing
this rule, we would not be understood as departing in the
slightest degree from the salutary one announced in *Coe v.
Van Why*, 33 Colo. 315, where it appeared that the statement
of counsel in argument that the defendant was insured in an
employers' liability company was made for the purpose of
prejudicing and influencing the jury in favor of the plaintiff,
and not to elicit information touching their competency to sit
as jurors in the case."

In *Bartell v. Griffin*, 47 Colo. 569, 108 Pac. 171, the Su-
preme Court again emphasized the same doctrine. It appears
that the trial court admitted, over objection, the following
question and answer, viz:

"Q. If you should lose this case, Mr. Bartell, you would
look to the bondsmen to settle with you for any damage you
would sustain? A. I surely would."

This ruling the court was pressed as reversible error in
the Supreme Court. The court said:

"There was no such issue in the case, and it was clearly
error to overrule the objection made. * * * As was said
in substance in *Coe v. Van Why*, 33 Colo. 315, in such case
counsel who thus seeks to obtain an advantage for his client
takes upon himself the risk of losing what he hopes to secure.
Cases should be tried before a jury on competent testimony.
The rights of litigants can only be preserved by adhering to
this rule, and when a party to an action insists upon getting
before a jury testimony which is incompetent and is intended
to prejudice the rights of his adversary, he does so at his

peril, when, as in the case at bar, the testimony on the issues made by the pleadings is conflicting, or is of that character that different conclusions of fact might be deduced therefrom."

From the three decisions last cited it seems to be settled in this jurisdiction that in cases of this kind it is reversible error to propound to veniremen such questions as we are now considering, when the matter inquired of is not in issue, and it appears to be equally prejudicial whether the objectionable information imparted to the jury in evident bad faith reached it by interrogating veniremen, addressing the jury, or examining witnesses.

As I analyze the Coe case, it is decisive of this appeal in favor of appellant upon the first three assignments of error. That case is rendered more emphatic as authority upon the point by reason of its being cited and followed in the subsequent cases to which I have alluded. These cases are binding upon this court, and there is nothing left for it to do but follow the rule there laid down. The general situation, as to facts and circumstances in the instant case, as I understand it, appears to be not substantially different from that of the cases cited. We ought not to disregard the supreme authority. Our Supreme Court is far from being alone in the rule it has adopted. On the contrary it is supported by a multitude of authorities of high standing, as the following list will disclose: *Fuller Company v. Darragh*, 101 Ill. Ap. 664; *Hordern v. Salvation Army*, 124 App. Div. 674, 109 N. Y. Supp. 131; *Frahm v. Siegel-Cooper Co.*, 131 App. Div. 747, 116 N. Y. Supp. 90; *Manigold Co. v. Black River Traction Co.*, 81 App. Div. 381, 80 N. Y. Supp. 861; *Donnelly v. Younglove Lumber Co.*, 140 App. Div. 846, 125 N. Y. Supp. 689; *Sawyer v. Arnold Shoe Co.*, 90 Me. 369, 38 Atl. 333; *Emery Dry Goods Co. v. De Hart*, 130 Ill. App. 244; *Hollis v. U. S. Glass Co.*, 220 Pa. 49, 69 Atl. 55; *Kentucky W. Mfg. Co. v. Duganics*, (Ky.) 113 S. W. 128.

There appears to be an exception to the rule stated in the Coe case, which is that, notwithstanding the error germinated by counsel's misconduct, if there are no close questions of fact and the record affirmatively shows that the same was not prejudicial to defendant, such error will not work a reversal. In recognition of the exception the case of *Tanner v. Harper*, 32 Colo. 156, 75 Pac. 404, may be cited. That was a personal injury case in which plaintiff's counsel told the jury, while it was being impaneled, that a certain insurance company was the real party in interest, to which objection was made and sustained, the court telling the jury that they should disregard counsel's remark. The Supreme Court held that such statement was not reversible error, provided the record affirmatively showed that defendant was not prejudiced thereby, and proceeded to say that:

"The great weight of the testimony on the question of the negligence of defendants in constructing the track, and also on the subject of the alleged contributory negligence of the plaintiff, was overwhelmingly in favor of the latter. * * * So it appears from the record that there were no close questions of fact in the determination of which the jury might have been unconsciously influenced by the consideration of extraneous and improper matter."

Comparing that case, as to issues of fact and proofs, with the one before us, I find the situation is entirely different. I do not think it can be fairly said in the case at bar that there are no close questions of fact involved. On the contrary, it seems that all the material issues being tried were sharply contested. There was sufficient evidence to have well sustained a verdict for defendant, had the jury so found. On the question of negligence and contributory negligence the testimony on the part of defendant shows that deceased was positively instructed by Webb, the manager of the mine, to not go into the incline at any time during working hours, and that for weeks prior to and at the time of the accident, printed or written notices to that effect were posted at the

portal of the incline, easily observable by all persons entering the same. On the other hand, plaintiff's testimony tends 'to show that no such notice was posted, and further that Webb told deceased to go into the incline at the time he did, and fix the roll. Webb denied that he ever gave deceased any such order. So upon these issues there was a close question of fact. As to the question of placing in the mine, and at the tipple, appliances and switches of a different character from those in use, we have the same situation—plaintiff's evidence showing that defendant had promised to do so, and defendant's evidence showing that no such promise was made. Here again was an issue that was a close question of fact. Again, defendant strenuously contended at the trial, and so contends on this appeal, that there is not sufficient evidence to show that Gobo failed to couple the car or failed to do his duty in seeing that the car did not escape as a wild car. There were other material issues of fact before the jury which were controverted. I think it clearly appears from the record that the evidence on all material issues of fact was in sharp conflict, and for that reason it is readily distinguishable from the Tanner case. It cannot be reasonably said here, as in that case, that:

"The great weight of the testimony on the question of the negligence of defendants * * * or the alleged contributory negligence of the plaintiff, was overwhelmingly in favor of the latter."

The most that can be fairly contended by either party is that the evidence was about equally balanced on these issues. The Tanner case preceded the Coe case, and the Supreme Court had the former before it when it announced the rule stated in the latter.

I think the judgment should be reversed and cause remanded.